[No. A015166. First Dist., Div. Two. Jan. 15, 1986.]

HATTIE M. FARROW, Plaintiff and Respondent, v.
MONTGOMERY WARD LONG TERM DISABILITY PLAN,
Defendant and Appellant.

**COUNSEL**

Mike C. Buckley, Richard R. Pickard and Crosby, Heafey, Roach & May for Defendant and Appellant.

Edwin J. Wilson, Jr., Jo Ann Parker and Gillin, Jacobson & Wilson for Plaintiff and Respondent.

OPINION

JAMES, J.*—Defendant, Montgomery Ward Long Term Disability Plan (the Plan), appeals from a judgment determining that it acted arbitrarily and capriciously in denying disability benefits to plaintiff Hattie M. Farrow (Farrow) and ordering the Plan to pay such benefits to her. We conclude that the Plan's denial of benefits was erroneous as it was not supported by substantial evidence and that a remand to the Plan administrators for further proceedings is required.

Many of the facts giving rise to this controversy are uncontroverted. On November 18, 1972, Farrow suffered a back injury while lifting a pot of soup onto the stove during the course of her employment in the kitchen of the San Leandro store of Montgomery Ward & Co., Inc. (Montgomery Ward). Her precise age at the time of the injury is not made clear in the record before us, but it appears that she was in her early 30's. Farrow was initially treated conservatively for the injury and continued working, although experiencing pain. She underwent back surgery in 1973 (a laminectomy and a foraminotomy) and in 1974 (a spinal fusion). She last worked for Montgomery Ward in December 1974 and has not worked to any substantial degree since the 1974 surgery.

The parties agree that the Plan is an employee welfare benefit plan covered by the Employee Retirement Income Security Act of 1974 (ERISA), 29 United States Code section 1001 et seq. (See 29 U.S.C. § 1002 (1); *Carter* v. *Montgomery Ward & Co.* (E.D. Tenn. 1977) 76 F.R.D. 565, 567.) Section 1.5 of the Plan defines total disability as follows: "The term 'Total Disability' or the term 'Totally Disabled' means (a) during the Waiting Period [a period during which short term benefits are payable under Montgomery Ward's Salary Continuance and Weekly Disability Benefit Programs] and for the next 24 months of Disability, inability of the Employee to perform each and every duty of his occupation, and (b) thereafter, inability of the Employee to engage in any substantially gainful occupation for which he is, or may reasonably become, qualified by reason of his education, experience, or training."

Farrow filed a claim for total disability benefits under the Plan on October 28, 1977. Although the claim was filed more than two years late under the terms of the Plan, the Plan did not attempt to disallow the claim as untimely.[1]

---

*Assigned by the Chairperson of the Judicial Council.

[1]Farrow had apparently been unaware of the possibility of receiving long term disability benefits under the Plan until shortly before the filing of her claim.

By a letter of December 27, 1977, the Plan's long term disability manager informed Farrow that the Plan had determined that she was not eligible for benefits beyond the first 24 months of disability. The letter stated in pertinent part: "The Trust has obtained information regarding your educational background and your previous working experience. This information has been submitted to the Trust Medical Board with your medical data. The Board has determined, based on all available information, that the evidence presented does not provide substantiation that you are totally disabled as requested [sic] under the Plan after the 24th month of disability. Therefore, we are unable to provide benefits beyond July 2, 1977, or after 24 months."[2] The letter also informed Farrow that she could request a review of the partial denial of her claim; that such review would be by either the administrative director or a member of the benefit plans committee; and that she could present additional medical evidence to support her claim of "total disability from all occupations" in connection with the review.

At the time of the December 27, 1977, denial, the Plan had the following medical reports before it regarding Farrow's condition: eleven letters from Farrow's treating physician, Dr. Thomas Schmitz, and one letter from Dr. Arthur Auerbach, who had examined Farrow on July 27, 1977, in the capacity of an agreed medical examiner for purposes of a worker's compensation claim. Both Dr. Schmitz and Dr. Auerbach engage in the practice of orthopedic medicine.

The letters from Dr. Schmitz spanned the period from May 1976 to October 1977. Some of his letters merely described in general terms Farrow's continuing problems with pain. Those that more specifically addressed her limitations included the following: letter of May 28, 1976, stating in part, "I think that we will rate her as permanent and stationary [apparently for worker's compensation purposes] at this time. She can sit for about 30 min., stand for approximately 30 min., and lift about 13 lbs."; letter of December 14, 1976, stating in part, "The patient is at a comfortable state at the present, in that she is able to do some light housework; however, she does not do any sweeping or heavy mopping"; letter of February 25, 1977, stating in part, "I think that the patient should be rated permanent and stationary and should not return to her job as a waitress"; letter of May 18, 1977, stating in part, "The patient has minimal pain in her back and left leg. When she stands for 15 min., sits for 15 min., or lifts more than 10 lb. [sic], she develops pain. She is not able to mop or vacumn [sic]"; letter of September 13, 1977, stating in part, "The patient could work in a job that

---

[2]On January 4, 1978, the Plan sent Farrow a check for $1,200, representing retroactive payment of benefits for the 24-month period from July 3, 1975, to July 2, 1977.

would allow her to sit and stand at intervals most comfortable to her. I am aware that other physicians have suggested that the patient is able to return to gainful employment but I am not sure, at this point, what area she could work in"; and letter of October 19, 1977, stating in part, "I feel that the patient is permanently disabled from the type of work that she previously did. If her condition improves, the patient might be able to work in a situation where she could sit and stand at intervals most comfortable to her. She would not be able to lift more than 15 lb. [sic]."[3]

Dr. Auerbach's letter of July 27, 1977, stated that he had examined Farrow on that date. He reviewed the history and treatment of Farrow's injury and noted that she was receiving workers' compensation and social security disability benefits. He reported that "[S]he has back pain off and on. She is not working. She can stand for a little while, she can sit for a little while. She can't bend much, she can't stoop much, and cannot lift at all. She states that it is hard for her even to do her housework." He also noted that she had been taking multiple analgesic medications, including Percodan. After reviewing Dr. Schmitz's reports on Farrow through May 18, 1977, and after performing his own physical examination, Dr. Auerbach reached the following conclusions: "Her condition is permanent, stable and rateable. I believe that the patient should be on only mild medication such as Darvocet II or aspirin at times. I do not believe that any other formal medical care would be of value. She is not a candidate for further surgery. There are the following SUBJECTIVE FACTORS OF DISABILITY: Slight pain in the back when doing bending, stooping, and some lifting increasing to moderate pain when doing heavier lifting at times. There are no OBJECTIVE FACTORS OF DISABILITY. There is some limitation of back extension as described. Taking into consideration the subjective and objective factors of disability I would states [sic] that the patient has a disability precluding heavy lifting and by this I mean she has lost approximately half of her pre-injury capacity for lifting. The patient is certainly not totally disabled and should be encouraged to return to gainful employment as soon as possible."

Shortly after being notified on December 27, 1977, of the Plan's decision, Farrow (apparently acting without counsel) exercised her right to seek a review of her claim. In connection therewith, she submitted a letter from Dr. Schmitz, dated January 12, 1978, which stated in pertinent part, "The patient can now sit for 15 minutes, stand for 15 minutes or walk for 15 minutes. I feel that the patient might be able to return to work if she could have a job with restrictions in line with her limited abilities; otherwise, I feel that she should continue on total disability."

---

[3]The dates of Dr. Schmitz's letters coincided closely with the dates of his examinations of Farrow.

On February 8, 1978, Farrow's present counsel wrote a letter to the Plan's long term disability manager, advising that he was representing Farrow concerning her claim. He enclosed copies of October and November 1977 reports from Dr. Schmitz, which he stated "indicate that the patient is in pain when she stands for more than 15 minutes, sits for more than 15 minutes, or lifts more than 10 pounds. Dr. Schmidt [*sic*] would place Ms. Farrow in category F in guidelines for work capacity,[4] which would place her disability at 50%." The letter also noted that Farrow had only an eleventh grade education, had no formal job training, and had work experience in jobs such as food service worker, assembly line worker and postal mail sorter, all involving the type of activities in which she is precluded from engaging. Another letter from Dr. Schmitz, dated February 21, 1978, was subsequently submitted. It stated that "the patient is able to sit for 15 min., stand for 15 min., and walk for 15 min. . . . . I feel that she is not capable of engaging in her previous occupation or any occupation with similar work requirements . . . . Her condition has not changed remarkably in the past six months. I think that it would be reasonable to attempt to retrain this patient."

On March 21, 1978, the benefits administration director of the Plan wrote a letter to Farrow reaffirming the denial of benefits after July 2, 1977. That letter stated in pertinent part, "In reviewing your file and the recent medical report submitted for review, the Medical Board does not feel that you meet the Plan requirements of total disability from any and all occupations. Dr. Schmitz has indicated that you can no longer perform your former occupation; however, the limitations he specifies do not prevent you from performing other types of work. The California disability rating he applies to your condition also indicates that you are not totally disabled but, in fact, are able to perform light work in a standing or walking position with minimal physical effort. We feel that there are many types of jobs available that would meet your physical requirements and for which you could qualify." The letter also informed Farrow that she could request a final review of her claim by the benefit plans committee and that any additional information which she wanted the committee to consider should be submitted. It also stated, "The Benefit Plans Committee may hold a hearing or conduct an independent investigation after your request is received."

Farrow exercised her right to seek further review of the decision denying her claim for benefits. The only additional information which she submitted

---

[4]Under the "Schedule for Rating Permanent Disabilities," published by the California Department of Industrial Relations in 1978 and used in connection with workers' compensation claims, category (f) of the "Guidelines for Work Capacity" provides: "*Disability Resulting in Limitation to Light Work* contemplates the individual can do work in a standing or walking position, with a minimum of demands for physical effort."

was a letter dated July 26, 1978, from Dr. Michael Goldfield, a psychiatrist. Dr. Goldfield had interviewed Farrow and reviewed her recent medical records and her medical history. He stated that Farrow was involved in a "cycle of pain producing anxiety," causing her to be afraid of experiencing more pain and to therefore limit herself physically; that she had nevertheless adapted to the pain quite adequately from an emotional point of view and was not exaggerating. He concluded as follows: "I presently find her to be permanent, stationary and rateable. I would rate her present emotional disability as being very slight. This would consist of anxiety and tension related to the constant pain. She also experiences anxiety and tension before and during the performance of any physical act . . . . There is no need for future psychotherapy." Dr. Goldfield's diagnostic impression was "psychophysiologic musculoskeletal reaction with some anxiety."

The Plan also obtained an additional letter from Dr. Auerbach, dated November 16, 1978, in which he noted that he had reviewed the report of Dr. Goldfield and reaffirmed his previous opinion, stating, "The patient continues to have an orthopedic disability precluding heavy lifting. She should be encouraged to return to some type of gainful employment as soon as possible."

On November 17, 1978, Reuben Berry, acting on behalf of the benefit plans committee, sent a letter to Farrow reaffirming the denial of benefits. It stated in pertinent part, "Your claim has now been reviewed by the Medical Board. Your disability has been evaluated with respect to the Plan provisions considering the definition of Total Disability. After the 24th month of disability benefits, Total Disability is defined as the inability to perform any and all occupations for which you are now, or may reasonably become qualified. The Board has affirmed our prior determination on the basis that you are not disabled from any and all types of occupations."

On December 12, 1978, Farrow filed her complaint in the court below. It alleged essentially that she was unable to perform any and all occupations for which she was then or might reasonably become qualified, based upon her age, education, training and skill. She sought a declaration of her rights under the Plan and an award of benefits.

The case went to trial before the court on July 6, 1981. Farrow testified regarding the circumstances of her injury and treatment, and her continuing problems with pain after being in a particular position for 15 or 20 minutes. She also described her education and work experience.

Dr. Henry Edington, an orthopedics specialist, also testified for the plaintiff. He had examined Farrow in February 1981. It was his opinion that

Farrow could only perform a job in which she could sit, stand or lie down at will. The court asked him his opinion as to whether Farrow could perform the job of an office receptionist. Dr. Edington thought that she would have some serious difficulties performing that work in the ordinary sense, but that it could be done if an employer would allow certain leeway and liberties. He was not familiar with the definition of total disability under the Plan and had no opinion as to whether Farrow was totally disabled within the meaning of the Plan.

David Fishman, the Plan's long term disability manager at the time of trial (although not at the time Farrow's claim was processed), was called as a witness for both the plaintiff and the defendant. When called by Farrow, he explained the method of calculation of benefits under the Plan, identified the medical reports regarding Farrow which the Plan had received before December 27, 1977, and testified that the Plan had not interviewed Farrow with respect to her physical condition or educational background, but relied solely upon her employment application with Montgomery Ward (apparently with respect to her education). He also testified that the "Medical Board" consisted of one doctor employed by the Plan; that the medical board had not observed or examined Farrow; that Dr. Auerbach was not asked to reexamine Farrow after her appeal request; and that the Plan did not conduct an independent medical investigation beyond a review of the initial file after Farrow's appeal request. When called by the Plan, Fishman described the procedural steps followed by the Plan in processing Farrow's initial claim and the appeals.

The Plan also called Dr. Auerbach as a witness. He reaffirmed his view that Farrow was not disabled to the point of being unable to perform any gainful occupation whatsoever and testified that in his opinion she could perform the job of a receptionist.

Farrow presented no rebuttal witnesses, and the cause was submitted on July 8, 1981.

On November 4, 1981, the trial court entered its findings of fact and conclusions of law. The findings were that (1) Farrow was covered by the Plan at all relevant times; (2) the Plan "acted arbitrarily and capriciously in determining that [Farrow] was not totally disabled within the meaning of the Trust Plan"; (3) Farrow had been totally disabled within the meaning of the Plan at all times relevant to the lawsuit; (4) Farrow was entitled to future benefits in the amount of $79.25 per month; and (5) Farrow was entitled to accrued benefits in the amount of $3,302.[5] The conclusions of

---

[5]The parties stipulated that these amounts were the sums due if Farrow were eligible for benefits.

law merely set forth that Farrow was entitled to such benefits plus costs and that she was entitled to a declaratory judgment that she was totally disabled within the meaning of the Plan. Judgment was entered accordingly. This timely appeal followed.

Under ERISA, state and federal courts have concurrent jurisdiction over actions brought by participants in employee welfare benefit plans to enforce their rights to receive benefits under the plans. (29 U.S.C. § 1132(a)(1)(B) and (e)(1).) ▮ The provisions of ERISA governing such plans preempt state law (29 U.S.C. § 1144(a)), and federal common law applies to determinations regarding entitlement to benefits under plans covered by ERISA. (*Jung* v. *FMC Corp.* (9th Cir. 1985) 755 F.2d 708, 714; *Peckham* v. *Board of Trustees, etc.* (10th Cir. 1981) 653 F.2d 424, 426; *Riley* v. *MEBA Pension Trust* (2d Cir. 1977) 570 F.2d 406, 413.) ERISA requires that fiduciaries of a plan discharge their duties "solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." (29 U.S.C. § 1104(a)(1)(A).) ▮ The United States Supreme Court has observed that among "the fiduciary obligations of plan administrators are [the duties] to serve the interest of participants and beneficiaries and, specifically, to provide them with the benefits authorized by the plan." (*Massachusetts Mut. Life Ins. Co.* v. *Russell* (1985) 473 U.S. —, — [87 L.Ed.2d 96, 104, 105 S.Ct. 3085, 3091].)

▮ Appellant contends, and respondent agrees, that the standard of review in this case is whether the Plan administrators acted arbitrarily or capriciously in denying Farrow's claim for long term disability benefits.[6] We agree that this is the proper standard for judicial review of a decision of administrators of an employee benefit plan governed by ERISA.

In a decision rendered after this case was decided in the court below, the United States Court of Appeals for the Fourth Circuit had occasion to examine the standard of review applicable to a case such as this in *LeFebre* v. *Westinghouse Elec. Corp.* (4th Cir. 1984) 747 F.2d 197. In *LeFebre*, as in this case, the claimant had been denied total disability benefits by the plan administrators. The trial court held that the decision had been arbitrary and capricious and that the claimant was entitled to benefits. (747 F.2d at pp. 199, 202,) The *LeFebre* court noted its previous holding in *Horn* v. *Mullins* (4th Cir. 1981) 650 F.2d 35, 37: " 'The standard for reviewing a

---

[6]Respondent states at page 28 of her brief: "Respondent agrees that the standard of review is whether the [decision of] the Plan was arbitrary and capricious in light of the facts before the Plan at the time of its decision."

decision of the trustees is whether it is arbitrary or capricious. (*Seafarers Pension Plan* v. *Sturgis* (630 F.2d 218, 221 (4th Cir. 1980).) To determine whether the action was arbitrary or capricious, we must first decide whether the trustees' decision was supported by substantial evidence.'" (*LeFebre* v. *Westinghouse Elec. Corp., supra,* 747 F.2d 197, 204.) "Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" (*LeFebre, supra,* at p. 208, quoting from *Laws* v. *Celebrezze* (1966 4th Cir.) 368 F.2d 640, 642.) The *LeFebre* court also observed that, pursuant to this standard, the scope of review is a narrow one under which the court is not empowered to substitute its judgment for that of the plan administrators.[7] (*Id.,* at p. 204.) "'A federal court is to focus on the evidence before the trustees at the time of their final decision and is *not* to hold a *de novo* factual hearing on the question of the applicant's eligibility. [Citation.]'" (*LeFebre, supra,* at p. 204, quoting from *Wardle* v. *Central States, Etc.* (7th Cir. 1980) 627 F.2d 820, 824, cert. den. (1981) 449 U.S. 1112 [66 L.Ed.2d 841, 101 S.Ct. 922].) (Italics added.)

In *LeFebre,* as here, the trial court considered the testimony of a medical specialist who had examined the claimant only after the law suit had been filed. "It was error for the district court to even consider the testimony of [the doctor] since it was not before the trustees on the issue of disability, and this is indicative of its retrial of the issues rather than [its giving] the narrow review [required]." (*LeFebre, supra,* 747 F.2d 197, 208.)

The *LeFebre* court found it "obvious" from the conclusions reached by the trial court that it had "substituted its judgment of the facts for that of the trustees and did not confine itself to the narrow scope of review required in passing upon the action of the trustees." (747 F.2d 197, 205.) It is likewise obvious here that the trial court improperly considered evidence which was not before the Plan and substituted its judgment of the facts for that of the administrators of the Plan. In our review of the propriety of

---

[7]*LeFebre* involved total disability benefits, as does this case. The standard of review is the same, however, with respect to all types of benefits due under plans covered by ERISA. It has been consistently held that a decision to deny benefits will be overturned when "(1) arbitrary and capricious, (2) not supported by substantial evidence, or (3) erroneous on a question of law." (See, e.g., *Ellenburg* v. *Brockway, Inc.* (9th Cir. 1985) 763 F.2d 1091, 1093; *Malhiot* v. *Southern California Retail Clerks Union* (9th Cir. 1984) 735 F.2d 1133, 1135, cert. den. (1985) 105 S.Ct. 959; *Wolfe* v. *J.C. Penney Co., Inc.* (7th Cir. 1983) 710 F.2d 388, 393, fn. 8, and cases there cited.)

denial of benefits to Farrow, we consider only the evidence which was before the Plan administrators at the time of their decision.

■ Farrow contends that the Plan's decision is not supported by substantial evidence because it was required to give examples of types of jobs which it contended she was capable of performing. We agree.

Farrow urges in support of her argument that since the definitions of total disability under the Plan and under the Social Security Act are very similar, it is appropriate in this case to apply by analogy principles developed in Social Security disability cases to determine whether the denial of disability benefits is supported by substantial evidence.[8] We will first examine those principles applicable to Social Security disability determinations.

Disability under the Social Security Act is defined, in relevant part, as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." (42 U.S.C. § 423(d)(1)(A).) The statute requires additionally a showing that the claimant "is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." (42 U.S.C. § 423(d)(2)(A).) We agree with Farrow that, insofar as relevant to the issue presented here, the Social Security Act's definition of disability is quite similar to the Plan's definition, which requires an "inability of the Employee to engage in any substantially gainful occupation for which he is, or may reasonably become, qualified by reason of his education, experience, or training." (§ 1.5 of the Plan.)

In *Hall* v. *Secretary of Health, Ed. and Welfare* (9th Cir. 1979) 602 F.2d 1372, the United States Court of Appeals for the Ninth Circuit held in a Social Security disability case that a general statement that a claimant can engage in "light" or "sedentary" work, without identification of specified jobs which the claimant has the physical and mental capacity to perform, taking into consideration the requirements of the job as well as the claimant's age, education and background, does not satisfy the substantial evidence test. (*Id.,* at pp. 1376-1377.) The *Hall* court observed that "[t]he burden of proving disability is on the claimant. (*Rhinehart* v. *Finch* 438

---

[8]As we have observed above, a reviewing court determines whether a denial of disability benefits by an administrator of a plan governed by ERISA is supported by substantial evidence. (*LeFebre* v. *Westinghouse Elec. Corp., supra,* 747 F.2d 197, 204.) Likewise, a reviewing court determines whether a denial of Social Security disability benefits is supported by substantial evidence. (42 U.S.C. § 405(g); *Smith* v. *Califano* (4th Cir. 1979) 592 F.2d 1235, 1236.)

F.2d 920, 921 (9th Cir. 1971).) Once [the claimant] establishes a prima facie case of disability by showing that a physical or mental impairment prevents him from engaging in his previous occupation, however, the burden of going forward with the evidence shifts to the Secretary. *Cox* v. *Califano,* 587 F.2d 988, 990 (9th Cir. 1978); *Benitez,* 573 F.2d at 655." (*Id.,* at p. 1375.) Ordinarily this burden is best met through the testimony of a vocational expert, although such testimony may be unnecessary when there is other reliable evidence of the claimant's ability to engage in other specified occupations. (*Id.,* at p. 1377.)

*Benitez* v. *Califano* (9th Cir. 1978) 573 F.2d 653 makes clear that the rationale for shifting the burden of producing evidence to the secretary in such circumstances is to prevent the claimant from having to prove a negative proposition, i.e. that there are *no* jobs whatsoever which he can perform: " 'To satisfy the statutory requirement that a claimant be unable to engage in any substantial gainful activity, it is not necessary that he introduce evidence which negatives every imaginable job open to men with his impairment, age, experience and education. . . . All that is required of the claimant is that he be unable to do the type of work that he was formerly engaged in and demonstrates his lack of particular experience for any other type of work. . . . Once the claimant has demonstrated that he can no longer engage in his former occupation, it is incumbent on the Secretary to show that there are other types of work which the claimant is capable of doing.' " (*Id.,* at p. 655, quoting *Rosin* v. *Secretary of Health, Ed. and Welfare* (9th Cir. 1967) 379 F.2d 189, 195.)

In 1978, after the claims proceedings involved in the *Hall* case, the Secretary of Health and Human Services (formerly Health, Education and Welfare) promulgated medical-vocational guidelines. (See 20 C.F.R. pt. 404, subpt. P, appen. 2 (1982); *Heckler* v. *Campbell* (1983) 461 U.S. 458 [76 L.Ed.2d 66, 103 S.Ct. 1952].) "These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled." (*Heckler* v. *Campbell, supra,* 461 U.S. 458, 461-462 [76 L.Ed.2d at pp. 71-72], fns. omitted.) *Heckler* held that when the guidelines accurately describe a claimant's abilities and limitations, the Secretary may rely upon the guidelines to

establish the existence of jobs which the claimant can perform and need not specify particular jobs available. "We think the Secretary reasonably could choose to rely on these guidelines in appropriate cases rather than on the testimony of a vocational expert in each case." (*Id.,* at p. 470 [76 L.Ed.2d at p. 77].)

The guidelines, however, describe only "major functional and vocational patterns," 20 C.F.R. pt. 404, subpart P, appen. 2, § 200.00(a), and if the medical-vocational guidelines "fail accurately to describe a claimant's particular limitations, the Secretary may not rely on them alone to show the availability of jobs for that claimant." (*Stone* v. *Heckler* (9th Cir. 1983) 722 F.2d 464, 468; accord *Gallant* v. *Heckler* (9th Cir. 1984) 753 F.2d 1450; see also *Heckler* v. *Campbell, supra,* 461 U.S. 458, 462, fn. 5.) Generally, when a claimant's limitations do not meet a defined exertional capacity, consultation with a vocational expert will be necessary to determine whether jobs exist which the claimant can perform. (See *Gallant* v. *Heckler, supra,* 753 F.2d 1450, 1457.)

If we draw the analogy to Social Security disability cases which Farrow urges, it follows that the Plan, which relied upon no medical-vocational guidelines, should have specified particular jobs which Farrow could perform or might reasonably become qualified to perform by reason of her education, experience or training, through the use of a vocational expert if necessary. We determine that it is appropriate to make this analogy.

In *Toland* v. *McCarthy* (D.Mass. 1980) 499 F.Supp. 1183, 1193, the court, reviewing a decision of trustees denying benefits under a pension plan within the meaning of ERISA, observed that "Congress may reasonably be understood to have expected that courts would turn for analogies to the body of law regarding judicial review of decisions of administrative agencies, even though that body of law is not directly in point in cases of review of the decisions of a private institution such as the trustees of an employee pension fund." Additionally, another court has analogized to the Social Security Act, more particularly the provisions of 42 U.S.C. § 423(d)(1)(A), in determining the "onset of disability" for purposes of disability retirement benefits under a plan governed by ERISA. (*Bruce* v. *K-Mart Corp.* (W.D.Ark. 1983) 568 F.Supp. 378, 382.) Thus the concept of courts turning to decisions in other appropriate contexts, such as Social Security disability cases, for guidance in developing the common law under ERISA is not novel. Furthermore, the legislative history of ERISA demonstrates that Congress intended courts to develop appropriate common law principles in cases governed by ERISA. "In presenting the Conference Report to the full Senate, for example, Senator Javits, . . . one of the two

principal Senate sponsors of ERISA, stated that '[i]t is also intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans.'" (*Massachusetts Mut. Life Ins. Co.* v. *Russell, supra,* 473 U.S. —, — [87 L.Ed.2d 96, 112, 105 S.Ct. 3085, 3097-3098], fn. omitted (conc. opn. of Brennan, J.).)

■ Courts have held in slightly different contexts that upon a certain showing, the burden of going forward is shifted from the claimant to the trustees or administrators of a pension or welfare benefit plan. (See, e.g., *Music* v. *Western Con. of Team. Pen. Trust Fund* (9th Cir. 1983) 712 F.2d 413, 419 ["The burden is initially on the plaintiff to show that the eligibility requirement under consideration (relating to a waiting period) is unreasonable or is 'arbitrary and capricious.' Once that showing is made, however, the burden shifts to the trustees of the Trust Fund to come forward with evidence establishing the reasonableness of the eligibility requirement, based on the purposes of the fund. (Citation.)"]; *Fine* v. *Semet* (11th Cir. 1983) 699 F.2d 1091, 1095 ["[A]fter (the claimant) met his initial burden of offering evidence of facially inconsistent treatment (with respect to payment of accrued benefits), the burden shifted to the trustees to show why they acted as they did."]; *Ponce* v. *Const. Laborers Pension Trust* (9th Cir. 1980) 628 F.2d 537, 543 ["[W]hen a vesting requirement is shown to exclude an unusually high percentage of plan participants, the burden shifts to the trustees to show the reasonableness of the requirement. (Citation.)"].)

We hold here that when a plan participant under a disability plan subject to ERISA makes a prima facie showing of entitlement to benefits, the burden shifts to the administrators of the plan to come forward with evidence showing that the claimant is not so entitled. What constitutes a prima facie showing of entitlement will vary depending upon the eligibility requirements of the particular plan in question. In this case, we deem a showing that the claimant cannot engage in her previous occupation and has no particular education, training or experience to qualify her for types of work which fit her physical limitations sufficient. Farrow made such a showing here.[9] The burden therefore shifted to the Plan to demonstrate that she is able to engage in a substantially gainful occupation for which she is, or may reasonably become, qualified by reason of her education, experience, or training.

---

[9]In this case, it is undisputed that Farrow was unable to engage in her previous occupation as a waitress or restaurant worker. Her counsel also pointed out to the Plan that Farrow had only an eleventh grade education, had no formal job training, and had work experience all involving, like her previous occupation, activities in which she is precluded from engaging due to her physical condition. These assertions were not controverted.

 We further hold that in order to satisfy the substantial evidence test to support a denial of disability benefits, the plan administrators cannot rely solely upon conclusory statements that a claimant can engage in "some" work or perhaps "light" or "sedentary" work. The Plan must specify particular jobs which it contends the claimant can perform or could reasonably become qualified to perform. Specification of such a job should be supported by a job description indicating that the job does not require exertion or skills beyond the capability of the claimant.

The facts and circumstances in *Gallant* v. *Heckler, supra,* 753 F.2d 1450, which parallel in many ways those of this case, aptly point out the need for the rule which we set forth in this opinion. There, the Social Security disability claimant, like Farrow, had undergone surgery for laminectomy, foraminectomy and fusion. (*Id.,* at pp. 1451-1452.) Gallant testified that "he could not sit over 10 minutes or stand over half an hour without back pain. He estimated he could lift between 5 to 10 pounds." (*Id.,* at p. 1453.) Conceding that Gallant had shown that he could not continue in his former employment as an operating engineer and truck driver, the administrative law judge (ALJ) found, however, that he could engage in light and sedentary forms of substantial gainful employment, without indicating precisely what evidence required this decision. (*Id.,* at pp. 1452-1453.) The Ninth Circuit observed: "Contrary to the ALJ's conclusion, the medical evidence and claimant's testimony depict an individual who cannot sit, stand or walk for any length of time without severe pain, and who must alternate periods of sitting, standing and walking throughout the course of each day. 'A man who cannot walk, stand or sit for over one hour without pain does not have the capacity to do most jobs available in the national economy.' *Delgado* v. *Heckler,* 722 F.2d 570, 574 (9th Cir. 1983)." (*Gallant* v. *Heckler, supra,* 753 F.2d 1450, 1454.)

The evidence here indicates that Farrow, too, must alternate periods of sitting, standing and walking. The evidence that she could only sit, stand or walk for approximately 15 minutes without pain was never refuted. The statements that she could do light or sedentary work were merely conclusory. We frankly do not know what jobs Farrow could perform, but we are not vocational experts.[10] If the Plan had specified with particularity jobs it

---

[10]The Plan contends that had it been required to specify jobs Farrow could perform, it could have turned to the secretary's medical-vocational guidelines to establish the existence of such jobs. As we indicate in the next paragraph of this opinion, the guidelines do not accurately describe Farrow's limitations. We express no view as to whether the Plan could adopt the secretary's guidelines, with appropriate notice to Plan participants, and thereafter apply them in cases falling within those guidelines to establish the existence of jobs suitable

contended Farrow is or could become qualified for, she would have been on adequate notice to present rebuttal evidence thereto, if such were available, and judicial review of the Plan's decision, if necessary, would have been facilitated by a more specific record.

The *Gallant* court also noted that the limitations of a claimant whose back pain prevents him from prolonged periods of sitting and standing and necessitates that he alternate periods of sitting, standing and walking do not fall within the secretary's medical-vocational guidelines: "To provide adjudicative guidance when a claimant's limitations do not meet a defined exertional capacity, the Secretary issued a 'Program Policy Statement.' SSR 83-12 Unempl.Ins.Rep. (CCH) (New Matters) ¶ 14,533 (1983). Under the heading 'Special Situations,' the statement discusses the impact of a finding that the claimant must alternate periods of sitting and standing. Such a claimant is defined as functionally not capable of doing either the prolonged sitting contemplated in the definition of sedentary work or the prolonged standing or walking contemplated for most light work. Because the occupational base is greatly reduced, the ALJ is directed to consult a vocational expert in such cases." (*Gallant* v. *Heckler, supra,* 753 F.2d 1450, 1457.) Thus even under the secretary's guidelines, a situation such as that of Gallant or Farrow would require particularized evidence as to what jobs the claimant could perform. In our view, the same is required of the Plan in this case.

The Plan contends that the result which we reach will overburden private disability plans which lack resources to develop the medical-vocational evidence required. We note first that not all cases will require extensive involvement of a vocational expert. In some instances, an evaluation of the claimant's medical history, background, work history and education combined with the use of a publication such as the Dictionary of Occupational Titles will enable plan administrators to specify jobs available for a claimant.[11] In others, a brief consultation with a vocational expert may be sufficient. There will, of course, be some cases which require more extensive

---

for claimants with particular limitations.

 The Plan also seeks to rely upon the testimony at trial that Farrow might perform the job of a receptionist. As this evidence was not before the Plan administrators, it cannot be considered by the court. Furthermore, that evidence consisted of simply a conclusory opinion. We find it hard to imagine that such a conclusion could be reached if the actual requirements of the job were specifically considered.

 [11]The Dictionary of Occupational Titles is a publication of the Employment and Training Administration of the United States Department of Labor. It sets forth standardized job duties and requirements for occupations in the United States and is designed to be used for assistance in the classification and placement of job seekers, career guidance and labor market analysis.

medical-vocational investigation and evidence. We do not deem this too great a burden for a plan to be required to meet in order to provide the individualized determinations of disability claims to which its plan participants are entitled. (Cf. *Mantolete* v. *Bolger* (9th Cir. 1985) 767 F.2d 1416, 1423 [under Rehabilitation Act of 1973, 29 U.S.C. § 791, "an employer has a duty under the Act to gather sufficient information from the applicant *and from qualified experts as needed* to determine what accommodations are *necessary* to enable the applicant to perform the job safely]." (Italics added.))

Although we have determined that the Plan's decision denying Farrow disability benefits is not supported by substantial evidence, the judgment of the court below ordering the payment of benefits cannot stand. The appropriate disposition in the circumstances of this case is a remand to the administrators of the Plan for the reprocessing of Farrow's claim. (See *Berry* v. *Ciba-Geigy Corp.* (4th Cir. 1985) 761 F.2d 1003, 1007 [if court believes administrator lacked adequate evidence, proper course is to remand to trustees for a new determination]; see also *Wardle* v. *Central States, etc.* (7th Cir. 1980) 627 F.2d 820, 824, cert. den. (1981) 449 U.S. 1112 [66 L.Ed.2d 841, 101 S.Ct. 922].)

The judgment of the superior court is reversed, and the matter is remanded to the Plan for reprocessing of Farrow's claim for disability benefits in accordance with the views expressed in this opinion.

Kline, P. J., and Smith, J., concurred.